Our final case to be argued is Kinsella v. South Fork Wind Bureau of Ocean Energy Kinsella v. Bureau of Ocean Energy Management Simon Kinsella v. Bureau of Ocean Energy Management May I reserve an additional three minutes because the five minutes I'm allotted may run a little tight for rebuttal. I will give you one extra minute. You can have five minutes for your main argument and one for rebuttal. Or if you want to split it four and two, but you have six total. Thank you very much. So we'll start the clock back up. And how much would you like for rebuttal? Just one minute. The one? Okay. All right. Thank you. There are seven claims in my second amended complaint. The first three claims, 1 through 3, are for fraud against South Fork Wind. The next three claims, 4 through 6, are against the U.S. Department of Interior's Bureau of Ocean Energy Management, BOEM, for violating the Outer Continental Shelf Act and the National Environmental Policy Act, NEPA, which concern the lack of any discussion, examination, or even acknowledgement of the impact of South Fork Wind's underground infrastructure on known PFOA and PFOS groundwater contamination, exceeding regulatory limits designed to protect human health post-construction. The last claim, 7, is against BOEM for violating NEPA, concerning the lack of an alternatives analysis, specifically a proposal which was discussed at length during the New York State Public Service Commission hearing to combine South Fork Wind with Sunrise Wind, which would have avoided the contaminated area. Mr. Kinsella, sorry to interrupt you. You might want to go ahead. We understand what the nature of the charges are. Okay. Jump right to what the argument is. Well, the seventh claim, the district court dismissed the seventh claim because I allegedly challenged a rate agreement, which federal defendants had no role and no authority to change, allegedly. The district court's order contradicted my second amendment complaint, which makes no mention of all of a rate agreement. The seventh claim concerns a technically feasible and environmentally superior alternative, which avoids onshore groundwater contamination and offers the same renewable energy at less than half the price of South Fork Wind, which BOEM neither explored, evaluated, nor devote any treatment to in violation of 40 CFR section 102, subsection 14. Such a ruling by the district court would set a far-reaching precedent in validating all future alternatives analysis under NEPA and New York Public Service Law Article 7. Under NEPA, BOEM's approval, absent an alternatives analysis, caused me to pay more for South Fork Wind's energy, and I suffered the injuries complained of regarding onshore construction. Therefore, Claim 7 is traceable to my injuries. The district court dismissed Claims 4 through 7 against BOEM because, and I quote, having considered the second amendment complaint, the court concludes that Kinsella lacks standing, causation and traceability to pursue his claims against federal defendants. The order alleges that I could not show a causal connection. The court was wrong. I have standing because without BOEM's approval, South Fork Wind could not proceed with onshore construction. I have three grounds for standing. One, New York State Public Service Commission joint proposal and a town easement agreement both mandate that South Fork Wind obtain BOEM's approval before it begin onshore construction. Secondly, at a continental shelf, Lands Act Regulation 30 CFR Section 585 and BOEM's own guidelines provide standing. And lastly, NEPA, which mandates that BOEM considers the project's connected and interdependent offshore and onshore segments also gives me standing. Standing point one, the main point upon which I filed a motion for reconsideration, was dismissed because I introduced new evidence demonstrating that under the New York State approval, the joint proposal and an easement agreement between the town, that South Fork Wind must have BOEM's approval before it could begin onshore construction, demonstrating that I have standing. This circuit ruled in Carver in New York City that as a rule, causation is shown if the defendant's actions had a determinative or coercive effect on the actions that produced the injury, which clearly it did here. Still, the district court dismissed the evidence supporting my standing because allegedly I could have found it by due diligence and therefore the evidence was not truly discoverable, quoting Space Hunters. In this case, I did have a good reason, unlike Space Hunters, for not presenting the evidence because the Public Service Commission joint proposal and the easement agreement had already been litigated and dismissed in a preceding case, also challenging BOEM's approval of South Fork Wind, Mahoney and U.S. Department of the Interior. Okay, Mr. Kinsella, so we've heard your five minutes of argument and we're going to hear from your adversaries and you'll have one minute for rebuttal. Ah, right. Time went very quickly. Thank you. It does go quickly. May it please the court, I'm Stacey Van Belleghem, Counsel for Intervenor Appellee, South Fork Wind, LLC. I will be primarily addressing appellant's claims against South Fork Wind and Ms. Lyons will primarily address appellant's claims against federal defendants. The South Fork Wind project is a fully constructed offshore wind project that went through a multi-year state and federal review process and was completed in July of 2024. For nearly two years now, South Fork Wind has been providing much needed power to homes and businesses on Long Island. Appellant's main objection is to a small portion of the project, construction of an onshore transmission cable that connects the offshore wind farm to the New York electric grid. Appellant claims that the project's onshore cable construction will exacerbate existing PFAS contamination that predates the project, but that claim was considered and rejected by the New York State Public Service Commission, which actually has jurisdiction over that onshore cable. After extensive proceedings that appellant participated in, the New York State Public Service Commission imposed mandatory conditions on the project for the handling of any PFAS contamination encountered during onshore cable construction. The New York Commission concluded that with those conditions, the onshore construction would not exacerbate existing PFAS contamination. Now, the underlying information supporting that conclusion has been vetted in proceedings involving multiple New York state and federal agencies, and plaintiff's grievances have been considered in state court, the federal district court in D.C., the U.S. Court of Appeals for the D.C. Circuit, the U.S. Supreme Court, and in the Eastern District below. But as agencies and courts have either rejected or dismissed appellant's arguments, he has increasingly alleged misconduct and fraud by the agencies, courts, and counsel. During this pending litigation process, appellant has sought sanctions against federal defendants, against South Fork Wind, counsel for South Fork Wind, and he sought disqualification of District Court Judge Frederick Locke. South Fork Wind and counsel for South Fork Wind categorically deny appellant's assertions of fraud and misrepresentation for all of the reasons that are explained in South Fork Wind's brief. Appellant fails to sufficiently plead any plausible claim of any element of common law fraud against South Fork Wind. There have been no findings of misrepresentation or fraud on the part of South Fork Wind by any agency or court, and not a single court has taken action against the project or granted appellant substantive relief. Appellant has been provided ample opportunity across multiple complaints and has failed to plead any justiciable claims against either South Fork Wind or federal defendants, and we ask that this court affirm. I'm happy to answer any questions the court might have. All right. Thank you. We have your argument. Great. Good morning. My name is Marika Lyons. I'm with the U.S. Attorney's Office for the Eastern District of New York, and I'm here to represent the federal defendants. The relief the plaintiff primarily seeks in this action, an injunction against construction of a since-completed wind energy project that he alleged would exacerbate existing conamination of soil in Wingscott, New York, and would cause him to pay higher rates for power, is not relief that he has standing to seek from the Bureau of Ocean Energy Management because the Bureau does not have jurisdiction over any onshore portion of the project and has no control over the energy rates that the plaintiff pays. The South Fork Wind project, which I'll refer to, that's what I'll refer to as the wind energy project, was a project composed of multiple components. In the big picture, there were two components, a wind farm or a set of wind turbines 35 miles off the coast of Montauk and 19 miles off the coast of Black Island out on the outer continental shelf, and then an export cable that connected that wind farm to Suffolk County, New York. And in turn, the export cable portion of the project had three components, a onshore component through Suffolk County, New York, a portion of about three miles through New York state waters, and then a portion of about 58 miles through federal waters. The Bureau of Ocean Energy Management only had jurisdiction over that portion of the project that was on the outer continental shelf, that is the export cable that was submerged more than three miles off the coast of Long Island, and then the portion that was actually the wind farm itself, the collection of 12 turbines. There was a different actor who had jurisdiction over the onshore portion of the project and the three-mile portion through New York state waters, and that was the New York State Public Service Commission. Pursuant to federal law and specifically the Outer Continental Shelf Lands Act and the Submerged Lands Act, the Bureau only has jurisdiction over those submerged lands that are over three nautical miles from the coast of any state, and that's pursuant to 43 U.S.C. 1331 and 1332 from the Outer Continental Shelf Lands Act and 42 U.S.C. 1301 from the Submerged Lands Act. When the intravenous repellent South Fork Wind sought to get approvals for this project, it moved in tandem and in parallel and sought approval both from the New York State Public Service Commission for the portions that it had jurisdiction over and from the Bureau for the portions that the Bureau had jurisdiction over. So in June 2018, South Fork Wind submitted its construction and operations plan to the Bureau, and the Bureau reviewed that. Around approximately the same time in September 2018, South Fork Wind submitted an application for the onshore portion of the project to the New York State Public Service Commission. The New York State Public Service Commission actually authorized the onshore portion and the portion through New York State waters first in March 2021, and then it was a few months later in August of 2021 that the Bureau approved the onshore portion. So the New York State Public Service Commission approved the onshore activities first. That is all to say that the Bureau just did not have jurisdiction over, did not approve the portions that plaintiff primarily complains of. Nonetheless, the plaintiff argues that the Bureau is liable or that he has standing to assert a claim against the Bureau for two primary reasons. First, he asserts that there are four provisions of the National Environmental Policy Act, one statutory provision and three regulatory provisions that provide standing, but those provisions did nothing to change the fact that the Bureau just simply doesn't have jurisdiction over anything onshore. Those provisions talk about a final environmental impact statement and what must be assessed in that statement. But again, none of it says that the Bureau has jurisdiction over or approved the onshore portions. And I would also point to the Supreme Court's recent decision in seven-county infrastructure versus Eagle County, which we cite to in our brief, which says that agencies don't need to assess environmental impact of actions that are outside of their authority. Further lending support to the argument that the Bureau simply wasn't authorized to, by statute, address the onshore portions of the project. Additionally, plaintiff points to an easement agreement between the Town of East Hampton and the Long Island Power Authority. There's a provision of that agreement that states that numerous conditions need to be followed before construction can start, including licenses, leases, and authorizations from various entities, both federal and state. Again, that easement agreement did not determine the site of onshore work or did not otherwise override the fact that the federal defendants did not have any effect or determinant effect on the onshore work. Ms. Lyons, I think we have your argument. Thank you. Thank you. In reply to South Fork Wind, I'd just like to point out that Kenneth Bowes submitted a false declaration. He stated, swore under penalty of perjury, that South Fork Wind does not require any approvals from BOEM in order to continue with onshore construction. He signed that. It contradicts another agreement he also signed a year earlier, where in that agreement, the easement agreement that Kenneth Bowes also signed, states that none of the rights granted to South Fork Wind may be exercised by South Fork Wind unless South Fork Wind shall have obtained all approvals and all authorizations required for the commencement of construction, including and not limited to the record of decision issued by BOEM. So clearly, Kenneth Bowes did submit a false declaration. There were many false declarations, and that's demonstrably false. They can't dispute that. Doc, I can show you the documents here for you if you want. The last point is that the New York State Public Service Commission did not consider PFAS contamination on site. It waited 15 days until after the evidentiary hearing had closed in the Public Service Commission proceeding before testing the site. And if you don't test the site, it is impossible, I repeat that, it is impossible to assess the impact of the concrete, which they specifically designed to absorb contaminated water, with the contaminants because you don't know what contaminants are there. It could be PFOA. It could be PFOA, so it could be anything. Okay. Mr. Kinsella, I think we understand your position. Thank you. Thank you to all of you for your arguments. We will take this case under advisement. And since this is our last case scheduled on our argument calendar, I believe we are ready to adjourn.